# In the United States Court of Federal Claims

No. 14-251 C

(Filed December 2, 2015)

**UNPUBLISHED**

```
* * * * * * * * * * * * * * * * * * * *
BISHOP HILL ENERGY LLC,         *
                                *    Anti-Assignment Act, 31 U.S.C.
        Plaintiff,              *    § 3727 (2012); Attempted
                                *    Assignment of Claim to Parent
        v.                      *    Corporation When Subsidiary Is
                                *    Sold to Third Party.
THE UNITED STATES,              *
                                *
        Defendant.              *
* * * * * * * * * * * * * * * * * * * *
```

    *John C. Hayes, Jr.*, Washington, DC, for plaintiff. *Alycia A. Ziarno* and *Brian P. Donnelly*, Washington, DC, of counsel.

    *Miranda Bureau*, United States Department of Justice Tax Division, with whom were *Caroline D. Ciraolo*, Acting Assistant Attorney General, *David I. Pincus*, Chief, *G. Robson Stewart*, Assistant Chief, *Blaine G. Saito*, Trial Attorney, Washington, DC, for defendant.

---

**OPINION**

---

**Bush**, *Senior Judge*.

    The court has before it Plaintiff's Motion to Substitute Invenergy Wind LLC as Plaintiff, filed October 7, 2015. The impetus for the motion is the pending sale of plaintiff to another corporate entity. Defendant opposes the motion and

proposes a compromise solution where Invenergy Wind LLC would be joined as an additional plaintiff under Rule 25(c) of the United States Court of Federal Claims (RCFC), rather than substituted as the sole plaintiff. Because defendant's compromise solution avoids a violation of the Anti-Assignment Act, 31 U.S.C. § 3727 (2012), and preserves plaintiff's claim, the court endorses defendant's compromise solution. Accordingly, as explained below, plaintiff's motion must be denied because the substitution of plaintiff proposed therein is invalid under the Act.

## I.   Proposed Assignment of Claim and Substitution of Plaintiff

There is a parent-subsidiary relationship between Invenergy Wind LLC (the parent, hereinafter "Invenergy Wind") and Bishop Hill Energy LLC (the subsidiary and plaintiff in this suit, hereinafter "Bishop Hill"). The relationship between these entities has been described by plaintiff in three different filings. First, in a prior discovery dispute, plaintiff described the relationship in this manner:

> From an organizational chart perspective, Bishop Hill is connected up through eight other entities to Invenergy Wind LLC (DE).

Pl.'s Mot. of Apr. 7, 2015, at 2. More recently, arguing for substitution of Invenergy Wind as plaintiff in this suit, plaintiff has provided more detail regarding this chain of "eight other entities":

> At the time this lawsuit was filed, Bishop Hill was a direct, wholly owned subsidiary of Bishop Hill Holdings LLC ("BH Holdings"). One hundred percent of the active, controlling membership interests in BH Holdings are owned by Bishop Hill Class B Holdings LLC ("BH Class B Holdings"), which in turn is an indirect, wholly owned subsidiary of Invenergy Wind LLC ("Invenergy Wind").

Pl.'s Mot. at 2 (footnote omitted). Plaintiff noted, however, that there is another owner of interests in one of the entities separating Bishop Hill from Invenergy

2

Wind:

> Firststar Development LLC ("Firstar"), a subsidiary of U.S. Bancorp, owns certain passive, non-controlling membership interests in BH Holdings. Firstar is the tax equity investor for the Bishop Hill Facility.

*Id.* at 2 n.1. Finally, in plaintiff's reply brief regarding its motion to substitute, after noting that Invenergy Wind is "a parent" of Bishop Hill, Pl.'s Reply at 1, plaintiff asserts that "Invenergy Wind is selling two wholly owned subsidiaries, but retaining all rights to pending lawsuits through an assignment agreement," *id.* at 2. Although what plaintiff means by "wholly owned subsidiaries" in its reply brief is far from clear, plaintiff has adequately identified the nature of the relationship between Bishop Hill and Invenergy Wind for the purposes of deciding plaintiff's motion to substitute Invenergy Wind for Bishop Hill as the sole plaintiff in this suit.

The next entity referenced in plaintiff's motion is the proposed purchaser of Bishop Hill:

> Invenergy Wind, through its subsidiaries, has agreed to sell Bishop Hill to an affiliate of SunEdison, Inc., an unrelated third party.

Pl.'s Mot. at 2. The affiliate of SunEdison, Inc. which has agreed to purchase Bishop Hill is identified by plaintiff in its reply brief as "TerraForm IWG Acquisition Holdings," or "TerraForm." Pl.'s Reply at 3. Thus, if the court understands plaintiff's upcoming business transaction, the subsidiaries of Invenergy Wind, which include at least one entity owned in part by Firstar Development LLC, intend to sell Bishop Hill to TerraForm. *Id.* As to the nature of Bishop Hill's current business, it appears to include a "wind energy facility [put] into service in 2012." Pl.'s Mot. at 1.

Rather than attempting to sell all of Bishop Hill's assets to TerraForm, the subsidiaries of Invenergy Wind intend to split off and retain the claim presented in this suit by assigning it to Invenergy Wind:

3

> Since this lawsuit was filed, Invenergy Wind, through its subsidiaries, has agreed to sell Bishop Hill to an affiliate of SunEdison, Inc., an unrelated third party. As part of the purchase and sale agreement, Invenergy Wind will retain ownership of all rights and interests in this lawsuit. Consequently, Bishop Hill now seeks to substitute Invenergy Wind, as transferee of Bishop Hill's interest in this case, as plaintiff in the lawsuit.

Pl.'s Mot. at 2. Both parties recognize that the assignment of plaintiff's claim against the United States implicates the Anti-Assignment Act. The parties disagree, however, as to whether the substitution of Invenergy Wind for Bishop Hill as plaintiff would violate the Act.

## II. Relevant Statutory Framework

The court begins with the plain text of the Act:

> (a) In this section, "assignment" means –
>
>   (1) a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim; or
>
>   (2) the authorization to receive payment for any part of the claim.
>
> (b) An assignment *may be made only* after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued.

31 U.S.C. § 3727 (emphasis added). Nonetheless, for over one hundred years courts have interpreted the Act to permit the assignment of claims, even when the claim has not been litigated to a conclusion, under certain conditions which do not implicate the hazards which the Act was designed to prevent. *Goodman v. Niblack*, 102 U.S. 556, 559-62 (1880). The largest group of judge-made exceptions to the Act falls under the category of transfers "by operation of law," a

category to which the court now turns.

## III.  Exceptions to the Act in Caselaw

The Court of Claims has reviewed exemptions from the Act created by judicial decision:

> Despite the broad language of the Act, and the courts' tendency at an earlier time to read it as an all-inclusive prohibition, numerous classes of assignments, although literally within the statutory ambit, have been judicially exempted from its operation.  The largest category of excised assignments are those which, in one form or another, occur by operation of law.  Various such assignments which are regularly held to be unaffected by the Act include the passage of claims to heirs and devisees, transfers made incident to proceedings in bankruptcy or receivership, transfers by the succession of one business entity for another, assignments made by judicial sale or order, and assignments produced by operation of the law of subrogation.  These classes of assignments are all thought to be outside the statute's scope because none of them threatens the dangers Congress sought to avoid by enacting the prohibition.

*Keydata Corp. v. United States*, 504 F.2d 1115, 1118 (Ct. Cl. 1974) (citations omitted).  The court notes that the sale of a subsidiary to an unrelated third party, and the simultaneous assignment of a legal claim of that subsidiary to a "parent" company, are not among the identified transfers of claims against the United States that are exempted from the operation of the Anti-Assignment Act in precedent binding upon this court.  Instead, there is a split in non-binding authority as to whether such an assignment violates the Act.

In one case, *National Australia Bank v. United States*, 54 Fed. Cl. 238 (2002), the court determined that certain corporate assignments of claims against the United States did not violate the Act.  *Id.* at 240 ("The Anti-Assignment Act is not offended by National Australia Bank choosing to refrain from collapsing its

corporate structure and merely retaining the claim [when it sold its subsidiaries]"). There may have been particular factual circumstances in *National Australia Bank* which influenced the court's analysis of assignments under the Act. For example, the subsidiaries in *National Australia Bank* were wholly owned by the parent. 54 Fed. Cl. at 239. Here, in contrast, Bishop Hill's owners are mixed. *See* Pl.'s Mot. at 2 n.1. When multiple owners of a subsidiary are involved, as here, the sale of the subsidiary is not as straightforward as the scenario outlined in *National Australia Bank*. *Cf.* 54 Fed. Cl. at 240 (noting in that case that the parent corporation could have "collapsed" its structure to absorb its wholly owned subsidiaries and their claims against the United States). Thus, *National Australia Bank* is factually distinguishable from this case, and the holding in that case is not necessarily applicable here.

Furthermore, *National Australia Bank*, a very short opinion, summarizes precedent pertaining to the Anti-Assignment Act in ways which could be misconstrued. For example, the court states that when "a claim is transferred to a different corporation by virtue of a merger or sale, [such] an event . . . does not trigger the Anti-Assignment Act." *National Australia Bank*, 54 Fed. Cl. at 239 (citing *Kingan & Co. v. United States*, 44 F.2d 447, 451 (Ct. Cl. 1930)). The holding in *Kingan*, however, is more narrow in scope than the above-cited statement in *National Australia Bank*.

Much of the holding in *Kingan* is founded upon a discussion of the Act in a case decided by the United States Supreme Court:

> "We cannot believe that Congress intended to discourage, hinder or obstruct the orderly merger or consolidation of corporations as the various states might authorize for the public interest. There is no probability that the United States could suffer injury in respect of outstanding claims from such union of interests and certainly the result would not be more deleterious than would follow their passing to heirs, devisees, assignees in bankruptcy, or receivers, all of which changes of ownership have been declared without the ambit of the statute. The same principle which required the exceptions heretofore approved applies here."

44 F.2d at 451 (quoting *Seaboard Air Line Ry. v. United States*, 256 U.S. 655, 657 (1921)). *Kingan* thus stands for the proposition that when corporations are merged or consolidated, the assignment of claims against the United States from the former entities to the newly-created entities does not offend the Anti-Assignment Act. In addition, corporate restructuring which cannot be strictly classified as a merger or a consolidation is also, by analogy, inoffensive under the Act. *See id.* ("[C]ertainly Congress did not intend to discourage or obstruct an orderly reorganization under the laws of the various states any more than it intended to discourage and obstruct orderly merger or consolidation of corporations under these laws.").

It is also important to note that *Kingan* is not on all fours with the case at bar. In *Kingan*, a British company was reformed as an American company, which later split off its non-American business to a newly-formed British company of its own creation and control. 44 F.2d at 447-48. A claim against the United States, held by the old British company, was transferred to the American successor company as the old British company dissolved, and this transfer was held to not offend the Anti-Assignment Act. *Id.* at 451. Because that transaction was more akin to a testamentary transfer, merger or bankruptcy, the assignment in *Kingan* raised no concerns of the type addressed by the Act. Plaintiff's proposed substitution, on the other hand, arises from very different facts – instead of a reborn company with a slightly altered name (changed from Kingan & Co., Ltd. to Kingan & Co., Inc.), the assignment here involves a sale of assets to a third party while a parent company simultaneously retains a subsidiary's legal claim against the United States.

Not only is the corporate transaction in *Kingan* entirely different from the one envisioned by Bishop Hill and Invenergy Wind, the underlying business context is also markedly distinguishable. In the case of *Kingan*, the physical asset involved in the claim against the United States was a packing plant whose operations triggered disputes over income tax liabilities which later matured into the plaintiff's claims. 44 F.2d at 447-48. The packing plant, along with all related claims and liabilities, was transferred from the old British company to the American successor. *Id.* The American successor continued to operate the plant. Here, in contrast, a third party owner will take over Bishop Hill's wind energy facility. Because *Kingan* approved of an assignment under radically different

facts,[1] the court cannot endorse plaintiff's reading of *National Australia Bank*, which relied almost exclusively on *Kingan* for this issue. Further, to the extent that *National Australia Bank* may be construed to have extended *Kingan* beyond the scope of the precedential holding in that case, the court declines to follow such a reading of *National Australia Bank* in this case.

At least one judge of this court has declined to follow *National Australia Bank* and its interpretation of the Anti-Assignment Act. *Centers v. United States*, 71 Fed. Cl. 529 (2006). The court in *Centers* noted that the facts under review in that case were basically indistinguishable, in all material aspects, from those in *National Australia Bank*. *Id.* at 535. A corporation, "Centennial," attempted to sell a small portion of its assets to a third party, while assigning its claim against the United States and most of its assets to its sole shareholder, Mr. Centers. *Id.* at 531. The court ruled that the assignment of the claim against the United States to Mr. Centers violated the Act:

> We think that transfers such as these implicate one, and perhaps two, of the recognized policies behind the Act. First, voluntary assignments such as the Centennial-Centers assignment present the possibility of double claimants. Indeed, in our case that possibility became manifest when Centennial sought reimbursement from [the United States] even after the assignment. That the subsidiary corporations in *National Australia Bank* did not attempt to recover on the assigned claim should not obscure the fact that the Government was vulnerable to multiple claimants and double payment. It is the very possibility of multiple claimants that the Anti-Assignment Act is intended to prohibit.
>
> Second, these transfers may adversely affect the availability of defenses and set-offs that the Government

---

[1]/ A similar case is *Kawneer Co. v. United States*, 100 Ct. Cl. 523, 538-39 (1943), which held that a corporate parent could consolidate its wholly-owned subsidiary into the parent and simultaneously assign the subsidiary's claim against the United States to the parent without offending the Act.

> would have had against the assignor. In this case, [the government] may have lost the ability to raise defenses and set-offs available vis-à-vis Centennial with respect to the claim now being advanced by Mr. Centers. Under the law of assignments, the Government's defenses in a suit by Mr. Centers would be limited to those offsets and counterclaims against Centennial that existed at the time of the assignment. The Government would lose those defenses and counterclaims that arose after the assignment. No such limits exist if Centennial sues on its retained claim.

*Id.* at 535 (citations omitted).

Most important, in the court's view, is the fact that the *Centers* opinion gave significant weight to the potential dangers of the assignment in question, and also noted that corporate sales which split assets from claims against the United States are not recognized as an exception to the Anti-Assignment Act in precedent binding on this court. *Id.* This is a prudent approach and *Centers* guides the court's analysis in this case. Because the sale of Bishop Hill to TerraForm does not fit within any of the recognized exceptions to the Anti-Assignment Act, under *Centers* this fact weighs against plaintiff's request to substitute Invenergy Wind for Bishop Hill as plaintiff in this suit. The court now turns to the parties' arguments regarding the dangers inherent in the assignment proposed by plaintiff in this case.

## IV. Dangers Avoided by Enforcement of the Anti-Assignment Act

It is not necessary to review all of the dangers that the Anti-Assignment Act is designed to prevent. As in *Centers*, only two types of dangers are potentially present here. First, the Act seeks to "prevent possible multiple payment of claims, to make unnecessary the investigation of alleged assignments, and to enable the Government to deal only with the original claimant." *United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 373 (1949) (*Aetna*) (citations omitted). Another purpose is to preserve the government's defenses, counterclaims and rights to set-off against the claim. *United States v. Shannon*, 342 U.S. 288, 291-92 (1952) (citation omitted). The parties vigorously debate whether these dangers are

present in the substitution of plaintiff proposed here.

The court finds that some of these dangers are already demonstrably present, and others are potentially present. The government has already been obliged to "investigate the alleged assignment" in order to discern whether the sale agreement clearly resolves the future ownership of the claim presented in this suit. *See* Def.'s Mot. for an Enlargement of Time of Oct. 21, 2015, at 2-3 (detailing government counsel's efforts to research the terms of the purchase and sale agreement underlying the assignment at issue in plaintiff's motion). The purchase and sale agreement attached to defendant's opposition brief includes one hundred eighty-seven pages, and the business transactions described therein appear to be quite complex.[2] The assignment of plaintiff's claim envisioned in this corporate sale does not appear to be nearly as simple as the assignments approved in *Kingan* or *Kawneer*, for example. On these facts, the assignment of plaintiff's claim to Invenergy Wind already poses one of the types of dangers addressed by the Act, *i.e.*, the need for the government to investigate "alleged assignments" of claims against the United States. *Aetna*, 338 U.S. at 373.

In addition, according to defendant, "[t]he Purchase Agreement [which governs the sale of Bishop Hill to TerraForm] says nothing about future counterclaims that could arise." Def.'s Opp. at 5. Plaintiff's reply brief does not refute defendant's assertion. It is therefore unclear to the court whether defendant will "deal only with the original claimant," *i.e.*, Bishop Hill, or will be obliged to prosecute any counterclaims against both Bishop Hill, under new ownership, and Invenergy Wind. This, too, is a danger that the Act seeks to prevent.

As far as the danger of multiple payments is concerned, plaintiff argues that multiple payments are not a concern here because Bishop Hill will have assigned its rights under this suit to Invenergy Wind. Pl.'s Reply at 3. In plaintiff's view,

> there is no legitimate possibility that Bishop Hill . . . , following the substitution of Invenergy Wind as plaintiff in this case, will then file [a] separate suit[] against

---

[2]/ The court has not conducted an in-depth review of the documents attached to defendant's opposition brief and states no position as to the legal effect of the purchase and sale agreement's terms.

> Treasury. Bishop Hill . . . ha[s] agreed to transfer all rights in [its] claims to Invenergy Wind in full view of both Treasury and this Court. It would defy all reason and common sense for Bishop Hill . . . to then attempt to bring separate claims following such a public assignment.

*Id.* Defendant argues that such assurances do not prevent a subsequent suit from being filed, which could result in multiple claimants and multiple payments. Def.'s Opp. at 10-11.

The court must agree with defendant. Although plaintiff insists that it is only multiple *payments* that concern courts when considering the Act, Pl.'s Reply at 3, it is clear that multiple claimants are also a legitimate concern. *See, e.g.*, *Aetna*, 338 U.S. at 373 (stating that the Act "enable[s] the Government to deal only with the original claimant"); *Kingsbury v. United States*, 563 F.2d 1019, 1024 (Ct. Cl. 1977) (holding that the Act "protects the Government from responding to others than [the original claimant], on her claim"). The court considers the danger of multiple payments and/or multiple claimants to be potentially present in this proposed assignment as well.

Finally, the court turns to the issue of government counterclaims, defenses and rights to set-off. Defendant argues that cases of the same type as this one sometimes involve counterclaims, defenses and rights to set-off, and that the Act functions to preserve those defenses for the government. Def.'s Opp. at 9-10. Plaintiff asserts, inaccurately, that there is no binding precedent which holds that the preservation of counterclaims and defenses is a purpose of the Anti-Assignment Act. Pl.'s Reply at 7. The Court of Claims in *Kingsbury* clearly noted such a purpose in the Act and that decision of the Court of Claims, among others, provides binding precedent for this court. *See* 563 F.2d at 1024 (stating that one of the three basic objectives of the Act is "to preserve for the Government defenses and counterclaims which might not be available against an assignee"); *see also, e.g.*, *Webster Factors, Inc. v. United States*, 436 F.2d 425, 430 (Ct. Cl. 1971) (holding an assignment to be "violative of the Anti-Assignment of Claims Act [in part because] it would deny the Government the right to set off certain downward tax adjustments from the upward tax adjustments in rent") (citations omitted).

Plaintiff's fall-back position is that defendant has failed to identify potential counterclaims that are at risk in the proposed assignment of its claim to Invenergy Wind. Plaintiff argues, for example, that any counterclaims would be as viable against Invenergy Wind as against Bishop Hill. Pl.'s Reply at 8-9. Plaintiff also contends that the government could always join Bishop Hill as a party if a counterclaim arose that was only valid against Bishop Hill and not against Invenergy Wind. *Id.* at 9.

The court is not convinced by plaintiff's arguments. It is well-established that the impairment of the government's defenses, counterclaims and rights to set-off are valid concerns enshrined in the Anti-Assignment Act. Splitting the claim against the United States from the company operating the wind energy facility has the potential for limiting the government's ability to protect its interests in this litigation. Defendant has adequately identified potential counterclaims that it might choose to raise in this suit. Def.'s Opp. at 9-10 & n.5. The assignment proposed by Bishop Hill, which could impair if not eliminate some of the defenses, counterclaims and rights to set-off that might otherwise be available to defendant, therefore poses yet another danger which the Act seeks to eliminate.

## V. Preservation of Plaintiff's Claim

The numerous dangers inherent in the assignment envisioned by plaintiff and the substitution of Invenergy Wind for Bishop Hill as plaintiff in this suit show that the procedure proposed by plaintiff violates the Anti-Assignment Act. Binding precedent compels the conclusion that the purchase and sale agreement, as summarized by plaintiff, cannot, by itself, be effective under the Act to assign plaintiff's claim to Invenergy Wind. In such a circumstance, the claim against the United States would remain with Bishop Hill. *See, e.g.*, *Wall Indus., Inc. v. United States*, 10 Cl. Ct. 82, 106 (1986) ("'[A]n attempted assignment of a claim against the United States does not forfeit the claim. It leaves the claim where it was before the purported assignment [*i.e.*, with the assignor].'" (quoting *Colonial Navigation Co. v. United States*, 181 F. Supp. 237, 247 (Ct. Cl. 1960)) (emphasis removed) (alteration in the original)). Thus, defendant's compromise solution, whereby plaintiff and Invenergy Wind would be joined as co-plaintiffs in this suit, generously provides plaintiff with the means for litigating its claim and avoiding plaintiff's proposed violation of the Anti-Assignment Act.

Plaintiff, somewhat incongruously, urges the court to reject defendant's compromise solution (and the proposed preservation of plaintiff's claim) on standing grounds. Pl.'s Reply at 9-10. According to plaintiff, Bishop Hill and "Invenergy Wind would not both have standing to simultaneously bring the same . . . claim." *Id.* at 9. Plaintiff cites no authority, however, for its standing argument, and the court declines to adopt plaintiff's contentions with regard to the standing issue where only a bare unsupported assertion has been presented for the court's review.

The court agrees with plaintiff, however, that there are fundamental differences between this case and *Rochester Gas & Electric Corp. v. United States*, 65 Fed. Cl. 431 (2005), the case relied upon by defendant as authority for its compromise solution. Nonetheless, the procedural innovation in *Rochester*, which permitted joinder, rather than substitution, of the buyer and seller of a nuclear power plant as co-plaintiffs, appears just as appropriate in this case. As defendant argues, "joining Invenergy Wind as a plaintiff to the case[] would help preserve set-offs and counterclaims that could arise and prevent multiple claims." Def.'s Opp. at 14. Even plaintiff notes the utility of having Invenergy Wind participate in this suit, because TerraForm, the new owner of Bishop Hill, would basically be a stranger to this suit. Pl.'s Reply at 4-5. The court finds that defendant's compromise solution advances many of the purposes of the Act and provides for practical litigation efficiencies as well.

The court acknowledges that there is slim authority for the solution that the government proposes. This court has, at least once, permitted co-plaintiffs to continue to pursue a claim against the United States, even after an attempted assignment between the plaintiffs was held to be void because of the Anti-Assignment Act. *Sun Cal, Inc. v. United States*, 21 Cl. Ct. 31, 36-37 & n.3 (1990) (citations omitted). But it is clear that the assignee of an invalid assignment occupies a precarious position in the litigation. *Id.* at 37 n.3. The court notes, too, that joinder, in certain circumstances, was disfavored in *Shannon*. *See* 342 U.S. at 293-94 ("[T]his theory that an assignee can avoid the Act by joining his assignor as a party defendant or an unwilling party plaintiff, would not only subvert the purposes of the Act but flood the courts with litigation . . . . We do not believe the Act can be by-passed by the use of any such procedural contrivance.").

The deciding factor in the current dispute, in the court's view, is that

13

defendant has consented to joinder in this case. It is clear that the government may waive the protections provided by the Anti-Assignment Act. *See, e.g.*, *Delmarva Power & Light Co. v. United States*, 542 F.3d 889, 893 (Fed. Cir. 2008) ("We see no valid reason why the government should not . . . be able to waive the Anti-Assignment Act's prohibition in section 3727(a) against the assignment of claims."). Although the full extent of the waiver here is not clear, at the very least defendant does not object to Invenergy Wind's participation in this suit. That is enough to proceed with this litigation with Bishop Hill and Invenergy Wind as co-plaintiffs.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiff's Motion to Substitute Invenergy Wind LLC as Plaintiff, filed October 7, 2015, is **DENIED**. Plaintiff shall **FILE** either a **Motion to Join Invenergy Wind LLC as Plaintiff under RCFC 25(c)**, or a **Notice** informing the court of any agreed-upon alternative to its proposed assignment, on or before **December 15, 2015**.

/s/Lynn J. Bush
LYNN J. BUSH
Senior Judge